BERGERCO CANADA, A DIVISION OF CONAGRA, LTD., Appellee,

v.

UNITED STATES TREASURY DEPARTMENT, OFFICE OF FOREIGN ASSETS CONTROL, Appellant.

No. 96–5225.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 15, 1997.

Decided Nov. 12, 1997.

Douglas N. Letter, Appellate Litigation Counsel, U.S. Department of Justice, Washington, DC, argued the cause for appellant. With him on the brief were Frank W. Hunger, Assistant Attorney General, Eric H. Holder, Jr., U.S. Attorney at the time the briefs were filed, William B. Hoffman, Chief Counsel, U.S. Department of Treasury, and Susan Klavens Hutner, Senior Counsel. R. Craig Lawrence, Assistant U.S. Attorney, entered an appearance.

Neil E. McDonell, New York City, argued the cause for appellee Bergerco Canada. With him on the brief was Ramon P. Marks. Stephen A. Weiner, New York City, and D. Edward Wilson, Jr., Washington, DC, entered appearances.

Before: WILLIAMS and RANDOLPH, Circuit Judges, and BUCKLEY, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge:

Bergerco Canada ("Bergerco") applied for a license to allow it to collect payment on a debt from frozen Iraqi assets, under a set of rules that gave it a very good chance of securing the license. The licensing agency—the Office of Foreign Assets Control ("OFAC"), a unit of the United States Treasury Department—then changed the rules, so that Bergerco had no chance whatever. Bergerco says that the new rule—or, more precisely, OFAC's application of the new rule to its pending submission—constituted retroactive rulemaking, and was therefore invalid under *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988), unless Congress had "in express terms" given OFAC "the power to promulgate retroactive rules." *Id.* at 208, 109 S.Ct. at 472. Because we do not think OFAC's application of the new rule was retroactive in the sense in which *Bowen* uses the term, we reject the claim without considering whether Congress gave OFAC such authority.

\* \* \*

Bergerco, a Canadian corporation, together with its U.S. affiliate Bergerco US, contracted with an Iraqi state trading company for sale and delivery of two large shipments of peas and beans, receiving as payment a letter of credit from an Iraqi banking institution, Rasheed Bank, for the total contract price of $4 million. Rasheed named the Royal Bank of Canada as an intermediary for the payment transaction, and designated The

Bank of New York as the reimbursing bank. This meant that the Royal Bank would look to The Bank of New York for reimbursement out of Rasheed's account there for any payment Royal Bank made to Bergerco on Rasheed's behalf. But Rasheed never asked The Bank of New York to be a "confirming" bank in the transaction. Had The Bank of New York agreed to such a role it would have substituted its credit for that of the Rasheed Bank, and assumed an obligation to pay Bergerco or the Royal Bank.

Bergerco made both shipments, and received payment for the first. After Bergerco's second shipment, and before payment of the remaining $2 million, Iraq invaded Kuwait. President Bush, using authority under the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701–06 (1997), quickly froze all Iraqi property interests in the United States, including Rasheed's funds on deposit with The Bank of New York. Executive Order No. 12,722 (55 Fed.Reg. 31803 (Aug. 2, 1990)); see also *Consarc Corp. v. Iraqi Ministry*, 27 F.3d 695 (D.C.Cir.1994) (describing asset freeze). The President soon issued another executive order to the Secretary of the Treasury, Executive Order No. 12,724 (55 Fed.Reg. 33089 (Aug. 9, 1990)), directing him to promulgate regulations governing the frozen assets and providing for their release to appropriate claimants. The Secretary of the Treasury in turn delegated this task to OFAC.

The sequence that concerns us followed. On August 15, 1990, OFAC issued "General License No. 7," which established criteria for the award of licenses essential to payment out of the blocked funds. This initial version said that "[s]pecific licenses may be issued on a case-by-case basis to permit payment, from a blocked account or otherwise, of amounts owed to or for the benefit of a U.S. person for goods or services exported by a U.S. person or from the United States prior to the effective date [of the blocking order] directly or indirectly to Iraq or Kuwait." See Addendum to Appellee's Brief.

On August 21, 1990 Bergerco filed its application for a license under General License No. 7. Although Bergerco is a Canadian corporation (i.e., not itself a "U.S. person") it still had a substantial prospect of securing the license, because its parent was a U.S. corporation and its U.S. affiliate was involved in the transaction.

On October 18, 1990 OFAC issued an amended, more restrictive, General License No. 7 regulation. This regulation—the one at issue here—provided that OFAC would grant licenses, again on a case-by-case basis, only to those creditors who held "an irrevocable letter of credit issued or confirmed by a U.S. Bank, or a letter of credit reimbursement confirmed by a U.S. bank," and who had shipped their goods or performed their services before the freeze. This was incorporated in a more formal set of rules adopted in January 1991. 31 CFR § 575.510(a) (1996).

On November 20, 1990 OFAC denied Bergerco's application. Because Bergerco's letter of credit was neither issued nor confirmed by a U.S. bank, its application failed to satisfy the new criteria.[1]

Bergerco sued OFAC, seeking a declaration of its entitlement to a license. (It also sued the Iraqi trading company and the banks, but only the dispute with OFAC is on appeal.) The district court agreed with the core of Bergerco's retroactivity argument, but granted narrower relief, remanding the case for the agency to consider Bergerco's application under the August 15 version of General License No. 7. *Bergerco Canada v. Iraqi State Company for Food Stuff Trading*, 924 F.Supp. 252 (D.D.C.1996).

■ No party has questioned our jurisdiction, although remands to an agency normally lack the finality necessary under 28 U.S.C. § 1291. *Occidental Petroleum Corp. v. SEC*, 873 F.2d 325, 329–30 (D.C.Cir.1989). There is an exception, however, applicable here, "where the agency to which the case is remanded seeks to appeal and it would have no

---

1. OFAC in all cases adopted its rules without following the notice-and-comment procedures of the Administrative Procedure Act, 5 U.S.C. § 553. It explained in its formal promulgation of rules that it was applying § 553(a)(1)'s exception for "foreign affairs functions." 31 CFR § 575.804(a) (1996).

opportunity to appeal after the proceedings on remand." *Id.* at 330.

\* \* \*

■ Bergerco and OFAC agree that some form of *Bowen*'s rule on retroactivity governs this case. Although OFAC, citing *United States v. Curtiss–Wright Export Corp.,* 299 U.S. 304, 320, 57 S.Ct. 216, 221, 81 L.Ed. 255 (1936), and related cases, urges that we apply *Bowen* in a spirit of deference appropriate to executive action in the foreign policy domain, it does not claim that the apparent applicability of § 553(a)'s foreign functions exception from notice-and-comment requirements moots the *Bowen* analysis.[2] Because we find that OFAC's decision does not run afoul of *Bowen* as conventionally understood, we do not consider whether the foreign affairs entanglement calls for applying a standard especially lenient toward the agency.

Virtually all changes in legal rules are both prospective and retroactive. At least until we devise time machines, a change can have its effects only in the future. But rule changes are also generally retroactive, in that they tend to alter the *value* of existing assets and thus the return on past investments. The effect is practically universal when we take human capital into account. Even so seemingly prospective a change as a relaxation of rules for admission to the bar changes the value at the margin of the human capital of those already admitted. See Michael J. Graetz, "Retroactivity Revisited," 98 Harv. L.Rev. 1820, 1822 (1985) ("Because all changes in law, whether nominally retroactive or nominally prospective, will have an economic impact on the value of existing assets or on existing expectations, the distinctions commonly drawn between retroactive and prospective effective dates are illusory."). In the broad sense, then, any legal system permitting change must tolerate a degree of retroactivity.

The Supreme Court in *Bowen* adopted no explicit definition of the sort of retroactivity that would trigger its requirement of explicit authorization, saying little more than that "[r]etroactivity is not favored in the law." 488 U.S. at 208, 109 S.Ct. at 471. But the rule in question there may give some idea of the core of the Court's concern. It involved the allocation, between the government and hospitals, of costs for performance of various past medical services. As Justice Scalia put it in his concurrence, the government's rule change was retroactive "in the sense of altering the *past* legal consequences of past actions." *Id.* at 219, 109 S.Ct. at 477 (emphasis in original). The rule in force at the time hospitals performed their services gave them a legal right to reimbursement at one rate; the Secretary's later rulemaking extinguished that right, replacing it with a right to reimbursement at a lower rate.

If such a rule is retroactive, in changing the legal rights flowing from previous acts, Justice Scalia also identified another type of retroactivity—"unreasonable secondary retroactivity," *id.* at 220, 109 S.Ct. at 477— which is of concern independently of *Bowen*'s insistence on explicit authority for changes to past legal rights. Retroactivity of this sort "makes worthless substantial past investment incurred in reliance upon the prior rule," and the courts may find it "arbitrary or capricious." *Id.* On this view there are two retroactivity limits in the APA: The first is a categorical limit, requiring express congressional authority and applying only in the domain of agency rules. The second limit is more elastic, governing all agency decision-making and involving the sort of balancing of competing values, both legal and economic, that often features in "arbitrary or capricious" analysis and that has historically governed retroactivity considerations in the agency context. See, e.g., *Yakima Valley Cablevision v. FCC,* 794 F.2d 737, 746 (D.C.Cir.1986) (reviewing courts must deter-

**2.** Insofar as the non-retroactivity norm derives from the words "future effect" in the APA's definition of rules ("the whole or a part of an agency statement of general or particular applicability and future effect ..." 5 U.S.C. § 551(4)), see *Bowen,* 488 U.S. at 216, 109 S.Ct. at 476 (Scalia, J., concurring), such an argument would not wash, as the norm under that view is independent of any requirement of specific rulemaking procedures. See also *Health Ins. Ass'n of America v. Shalala,* 23 F.3d 412, 422–25 (D.C.Cir. 1994) (applying *Bowen*'s non-retroactivity norm to interpretive rules to extent that they were to be used to support agency's claim in retrospective litigation).

mine whether agency has balanced "mischief" of retroactive application of a rule against "salutary effects, if any, of retroactivity"); see generally 2 Kenneth Culp Davis & Richard J. Pierce, Jr., *Administrative Law Treatise* §§ 6.6, 13.2 (1994 & Supp.1996).

The *Bowen* majority, to be sure, neither embraced nor rejected Justice Scalia's view. But the character of the rule at issue in *Bowen* is not the only evidence that the Court as a whole does not reject his view about the *kind* of agency action covered by the categorical bar against unauthorized retroactivity. In *Landgraf v. USI Film Products*, 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), the court considered when a statute should be found to have retroactive effect. It read the prior cases as establishing a rule of construction requiring that a statute be interpreted to have no such effect except where there is "clear congressional intent favoring such a result." *Id.* at 280, 114 S.Ct. at 1505. To decide whether a statute's effects would be retroactive, a court must determine whether the statute "would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Id.* The rule in *Bowen* fits squarely within the first of these types, for it impaired the right to reimbursement at a given rate that the hospitals possessed when they provided their services.

The Court has since made clear that the three types set forth in *Landgraf* are not the only forms of retroactivity covered by its "clear expression" rule of legislative construction. Indeed, that doctrine may well reach beyond the sort of rights-based, formal retroactivity represented by the Court's three types. *Hughes Aircraft Co. v. United States ex rel. Schumer*, — U.S. ——, ——, 117 S.Ct. 1871, 1876, 138 L.Ed.2d 135 (1997) (explaining that *Landgraf* endorsed a "functional," or interest-based, conception of retroactivity). For purposes of applying *Bowen*, however, we see no evidence that the scope of its presumption reaches beyond such formal retroactivity. Indeed, we have relied on *Landgraf*'s formal categories in applying *Bowen*, see, e.g., *DIRECTV v. FCC*, 110 F.3d 816, 825–26 (D.C.Cir.1997), leaving any residual "unreasonable secondary retroactivity" to conventional analysis for arbitrary and capricious agency action, *id.* at 825.

Even the formal categories, of course, are not self-applying. Take the first of the *Landgraf* categories, the only one showing any promise for Bergerco, posing the question whether OFAC's change "impair[ed] rights [Bergerco] possessed when [it] acted." This requires us to examine the legal status prevailing at the time Bergerco acted, that is, before the change of which it complains. Even in its categorical (i.e., non-balancing) aspect, retroactivity law is concerned with the protection of reasonable reliance. Thus in *Bowen* the Court quoted an earlier case saying that the "power to require readjustments for the past is drastic." 488 U.S. at 208, 109 S.Ct. at 472 (quoting *Brimstone R. Co. v. United States*, 276 U.S. 104, 122, 48 S.Ct. 282, 287, 72 L.Ed. 487 (1928)). See also *Bowen*, 488 U.S. at 223–24, 109 S.Ct. at 479–80 (Scalia, J. concurring) (drawing on interpretive principle of looking with disfavor at retroactive legislation). Thus, we must ask whether the legal status quo ante created "rights" favorable to Bergerco and later modified.

Here the relevant legal status quo is necessarily the original version of General License 7. If Bergerco were attacking President Bush's freeze order, which created a gap in the ordinary rules of commercial and banking law, it could identify as the key "act" the sale and shipment of peas and beans to Iraq, in exchange for a letter of credit, which occurred under those pre-existing norms. But in fact Bergerco challenges not the freeze order but only the October 18 amendment, which narrowed the earlier version of General License No. 7. And the only act that Bergerco performed in possible reliance on the prior license regime was to file its application. The question is, therefore, whether the August 15 version of General License No. 7 gave Bergerco rights that it could secure by filing a license application, or at any rate gave it the opportunity to secure rights by such a filing.

There is one sense, of course, in which Bergerco did have a right as of August 15 to have its license application processed under

the criteria in force at the time: If OFAC had acted on Bergerco's application the day it was filed. (August 21) and denied the license, Bergerco could have obtained judicial relief if OFAC had departed from the then-applicable rules, and could have obtained at least a remand for the exercise of OFAC's discretion in accordance with those criteria. But if the expectation enjoyed by Bergerco on the basis of this basic rule-of-law concept qualified as a "right" for purposes of determining impermissible retroactivity, then virtually every licensing applicant would acquire protection from any rule-made variation in licensing standards, even where the original set of rules was vague or obviously provisional.

We have rejected any such broad view of applicants' rights. In *DIRECTV v. FCC* we said that an explicit agency policy to allocate forfeited or surrendered direct broadcast channels gratis to existing licensees, later abandoned in favor of an auction policy, failed to establish any "right" as the term was used in *Landgraf*, which we viewed as dispositive under *Bowen.* 110 F.3d at 825–26. And recently, in *Chadmoore Communications, Inc. v. FCC*, 113 F.3d 235, 240–41 (D.C.Cir.1997), we held that despite *Bowen* the agency could evaluate what was substantially equivalent to a license application (actually, an application for an extension of time within which to complete an already licensed communications system) under rules amended after the application's filing, because the original rules established no "right" to a given outcome. See also *Hispanic Info. & Telecommunications Network v. FCC*, 865 F.2d 1289, 1294–95 (D.C.Cir.1989).

As a further basis for claiming that the August 15 version of General License No. 7 gave it a right to have its license processed under its terms, Bergerco points to OFAC's own regulation § 575.402. This states:

Any amendment, modification, or revocation of any section of this part or of any order, regulation, ruling, instruction, or license ... shall not, unless otherwise specifically provided, be deemed to affect any act done or omitted to be done, or any ... proceeding commenced or pending prior to such amendment, modification, or revoca-

tion. All penalties, forfeitures, and liabilities under any such order, regulation, ruling, instruction, or license shall continue and may be enforced as if such amendment, modification or revocation had not been made.

31 CFR § 575.402 (1996).

The full context of this rule—especially the references in the last sentence to forfeitures, penalties, and liabilities—leaves us doubtful whether the provision is intended to freeze licensing regulations as Bergerco contends. But we pass over that objection. Bergerco acknowledges that § 575.402 was promulgated *after* OFAC had issued the amendments to General License No. 7. It parries that objection, however, with a claim that the section reflects "a longstanding policy consistently enunciated by OFAC" in its regulations governing other asset-freeze regimes. Appellee's Brief at 21. We will assume as much, although in fact Bergerco cites no evidence of the principle's being applied to rules governing license applications. The timing of events is crucial here. OFAC issued both its original and amended General License No. 7 before promulgating final general regulations. Given the obvious haste with which OFAC was acting, even a principle that generally grandfathered license applications, established by regulation and followed over a long term, would not establish a similar right to stability for rules that had been hatched recently and in haste, and were thus, in all likelihood, in flux. Indeed, we note that nowhere in its correspondence with OFAC did Bergerco cite the policy it now says OFAC has always followed, apparently even after § 575.402 itself was promulgated. See Joint Appendix 203–68.

We may assume arguendo that "rights" can sometimes encompass an expectation of a license or permit where the criteria are so clear, simple, and firmly established that issuance of the permit is automatic and ministerial, cf., e.g., *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 158, 2 L.Ed. 60 (1803), or where the agency has explicitly committed itself to grandfathering applications. Here, however, the "may" in the August 15 version of General License No. 7, the variety of terms lending themselves to interpretive dis-

pute, and the rule's novelty and hurried adoption all suggest the absence of "rights" susceptible to impairment, as the term has come to be used in applying *Bowen,* and we find no such rights.

Considering the concern expressed in *Bowen* for preventing "drastic" assaults on reasonable expectations, it is also pertinent, in assessing whether the superseded regime created "rights," to consider the character of any acts that it invited parties to take and that the new regime undermined or rendered futile. Because we are assessing a rule, we look not to the acts of Bergerco but to the sort of acts the antecedent regime invited, and that the new regime undermined, as a general matter. Here, in fact, they coincide, as the only such acts appear to be what Bergerco did—the filing of a simple license application. The insignificance of the effort involved in such an application weighs strongly against any idea that the superseded regime established any "right" to an outcome under its rules. There is nothing inherently "drastic" about applying a new rule to a previously filed application where the effect of doing so is merely to render wasteful the trivial expense of such a filing.

We note that the August 15 version of General License No. 7 appears ambiguous as to whether it extends the possibility of a license to persons who purchased the claims of vendors who had actually supplied goods or services to Iraq before the freeze.[3] But even if we assume the original license criteria held out the possibility of licenses for such transferees, our analysis would not change— despite the possibility of buyers finding themselves in possession of a worthless claim. Because nothing in the October 1990 version treated transferees *more* severely than did its predecessor, transfers of the payment rights would not qualify as acts both invited by the prior regime *and* undermined by the change. That the superseded regime (including the background law on transferability of choses in action) contemplated and permitted such transfers of payment rights gives no boost to a contention that the original license regime created *Bow-*

*en*-protected rights, for such transfers would merely shift the locus of the risk of nonrecovery from one party to another. In *Bowen* itself, by contrast, the retroactive change to the reimbursement rule resulted in a substantially increased and unreimbursed net expenditure on medical services—a cost no one would have incurred had HHS originally promulgated the lower reimbursement rate.

Because General License No. 7 did not in its original form establish "rights" of the sort protected by *Bowen,* Bergerco has no ground for claiming the grandfathering of its license application.

The judgment of the district court is

*Reversed.*

3. The rule speaks of licenses for payment of "amounts owed to or for the benefit of a U.S. person for goods or services exported by a U.S. person or from the United States."