CELTRONIX TELEMETRY, INC., Appellant/Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION, et al., Appellee/Respondents.

Nos. 00–1400 & 00–1401.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 18, 2001.

Decided Nov. 16, 2001.

Rehearing and Rehearing En Banc Denied Jan. 10, 2002.

Richard S. Myers argued the cause and filed the briefs for appellant/petitioner.

Stewart A. Block, Counsel, Federal Communications Commission, argued the cause for appellee/respondents. With him on the brief were Jane E. Mago, General Counsel, Daniel M. Armstrong, Associate General Counsel, Catherine G. O'Sullivan and Andrea Limmer, Attorneys, U.S. Department of Justice.

Before: GINSBURG, Chief Judge, HENDERSON, Circuit Judge, and WILLIAMS, Senior Circuit Judge.

Opinion for the Court filed by Senior Circuit Judge WILLIAMS.

STEPHEN F. WILLIAMS, Senior Circuit Judge:

In 1994 the Federal Communications Commission auctioned off a group of Interactive Video and Data Service ("IVDS") licenses. In 1997 it changed the rules governing grace periods for winning bidders who made late installment payments. Celtronix, a winning bidder for such a license, alleges that the change was unlawfully retroactive. We affirm the Commission's decision.

\*　　\*　　\*

In a June 1994 auction Celtronix (then known as Community Teleplay, Inc.) won an IVDS license for the Norfolk–Virginia Beach Metropolitan Service Area. As a small business, Celtronix was allowed to

pay its winning bid in installments over the term of the license. 47 C.F.R. § 1.2110(d) (1994). The regulation provided that any payment would be in default after 90 days delinquency, but allowed a licensee to request a three-to-six-month grace period. *Id.* § 1.2110(d)(4)(i), (ii). In considering whether to grant the grace period, the Commission could consider the licensee's payment history, the reasons for default, the licensee's financial condition, and other circumstances. *Id.* Though its regulations were not exactly clear on the availability of additional grace periods, the Commission issued a public notice claiming discretion to "extend or grant additional grace periods where circumstances warrant." Public Notice, *"Wireless Telecommunications Bureau Staff Clarifies 'Grace Period' Rule for IVDS 'Auction' Licensees Paying By Installment Payments,"* 10 FCC Rcd 10724, 1995 WL 704458 (1995).

In 1997 the Commission changed its grace period rule in the *Third Report and Order and Second Further Notice of Proposed Rule Making,* 13 FCC Rcd 374, 1997 WL 797529 (1997) (*"Grace Period Order"*). Under the new regulation, a licensee who missed a payment would automatically have 90 extra days to do so without being considered delinquent. 47 C.F.R. § 1.2110(f)(4)(i) (1998). This came at the price of a 5% late fee on the amount past due. *Id.* Failure to make payment at the end of the first 90–day period would result in a second automatic 90–day grace period and a 10% late fee. *Id.* § 1.2110(f)(4)(ii). (Formerly, there had been an interest charge, amortized over the term of the license.) Any licensee failing to make payment after 180 days delinquency (or failing to pay the late fee) would then be in default. *Id.* § 1.2110(f)(4)(iii), (iv).[1]

Celtronix filed a petition for reconsideration of the *Grace Period Order* in Janu-

ary 1998 and, in July of that year, an emergency motion for stay pending review of the petition. But in September 1998, just before the final date on which Celtronix's license would have been permanently defaulted, the Commission announced a notice of a proposed rulemaking aimed at introducing new flexibility for spectrum occupied by IVDS licensees; to reflect the change it immediately redesignated the service as the "218–219 Mhz Service." *Amendment of Part 95 of the Commission's Rules to Provide Regulatory Flexibility in the 218–219 MHz Service, Order, Memorandum Opinion and Order and Notice of Proposed Rulemaking,* 13 FCC Rcd 19064 ¶ 16, 1998 WL 634717 (1998). For the duration of that rulemaking the Commission suspended all installment payments for licensees who were paid up through March 16, 1998 or had properly filed grace period requests. *Id.* ¶ 13.

In its final order on the 218–219 Mhz Service, *Amendment of Part 95 of the Commission's Rules to Provide Regulatory Flexibility in the 218–219 MHz Service, Report and Order and Memorandum Opinion and Order,* 15 FCC Rcd 1497, 1999 WL 705096 (1999) (*"218–219 MHz Service Order"*), the Commission dismissed Celtronix's grace period requests and its emergency stay motion, saying that parties that had properly filed grace period requests had already received "an extended grace period." *Id.* ¶ ¶ 45, 133. It also provided three options for licensees in Celtronix's situation: (1) reamortization and the resumption of installment payments; (2) amnesty, under which the licensee could return the license, have its debt forgiven, and receive a partial refund of prior payments; and (3) prepayment of the entire amount. *Id.* ¶ 34. Additionally, the Commission provided that the former 5–

---

**1.** The current version of the rule provides that the grace period shall be a quarter year, rather than 90 days, but is otherwise similar in substance. 47 C.F.R. § 1.2110(g)(4)(i) (2000).

year term would be extended to 10 years. *Id.* ¶¶ 25–32.

Celtronix sought reconsideration of the *218–219 MHz Service Order* in December 1999. While that was pending, the Commission denied Celtronix's petition for reconsideration of the *Grace Period Order. Amendment of Part 1 of the Commission's Rules—Competitive Bidding Procedures, Order on Reconsideration of the Third Report and Order, Fifth Report and Order, and Fourth Further Notice of Proposed Rule Making,* 15 FCC Rcd 15293, ¶ 27, 2000 WL 1140602 (2000). Then, in December 2000, the Commission denied reconsideration of the *218–219 MHz Service Order,* and reaffirmed that IVDS licensees must decide among the three options of amnesty, resuming repayment, or prepayment of the entire amount. See *Amendment of Part 95 of the Commission's Rules to Provide Regulatory Flexibility in the 218–219 MHz Service, Second Order on Reconsideration,* 15 FCC Rcd 25020, ¶¶ 1, 34, 2000 WL 1818363 (2000). It rejected Celtronix's proposal of a fourth option under which licensees could disaggregate, i.e., could retain part of their 218–219 Mhz spectrum for a given market and return the rest to the Commission. *Id.* at ¶¶ 14–20.

Celtronix chose to return the license to the Commission for amnesty, subject to its claim for a disaggregation alternative. It filed a petition for reconsideration of this order, which is still pending before the Commission.

As to the *Grace Period Order,* Celtronix filed a petition for review under § 402(a) of the Communications Act (No. 00–1401) and an appeal under § 402(b) (No. 00–1400). Since these jurisdictional provisions are mutually exclusive, see *Freeman Engineering Associates, Inc. v. FCC,* 103 F.3d 169, 177 (D.C.Cir.1997), and because Celtronix's case falls into none of the categories in § 402(b)(1) through (8), we dismiss appeal No. 00–1400 and take jurisdiction for No. 00–1401 under § 402(a).

There is another jurisdictional concern. Given Celtronix's election of amnesty in the event that its disaggregation proposal does not prevail (either by Commission change of heart or by judicial reversal of the Commission), there is a distinct chance that Celtronix would not benefit from a victory here; absent disaggregation, it would simply take its amnesty and depart. But we do not see this possibility as impairing its standing. Compare a standard two-issue case: If a plaintiff presents two or more alternative grounds as routes to its hoped-for ultimate victory, a court does not lose jurisdiction over the second claim once it has ruled in the plaintiff's favor on the first claim; victory on the first claim doesn't moot the second. *Air Line Pilots Ass'n Int'l v. UAL Corp.,* 897 F.2d 1394, 1397 (7th Cir.1990). Conversely, if a party must prevail on both of two theories to achieve a meaningful win (e.g., knock out a regulation), its loss on the first does not moot the second. *WorldCom, Inc. v. FCC,* 246 F.3d 690, 695 (D.C.Cir.2001). For both situations, the continued exercise of jurisdiction by the court is based on a practical consideration: Disposition of both bases has the potential of achieving judicial economies, as higher-level review might remove the first basis for the outcome. See *id.*

Just as the contingent character of the ruling on the second issue in the above cases does not spell mootness, so too the fact that here Celtronix's ultimate success may depend on the outcome of pending administrative litigation should not be seen as rendering the harm inflicted on it by the Commission's grace period decision too "conjectural" for purposes of standing. *City of Los Angeles v. Lyons,* 461 U.S. 95, 102, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). Otherwise, a party requiring victory on

two fronts in two fora could easily lose his chance for review on the first claim to be put forward for adjudication, see 28 U.S.C. § 2344 (requiring petition for review to be filed within 60 days), thus destroying his chance of prevailing, regardless of the merits.

\* \* \*

Celtronix argues that the new grace period rule, 47 C.F.R. § 1.2110(g)(4), violates the Administrative Procedure Act, which limits "rules" to agency prescriptions of "future effect." 5 U.S.C. § 551(4); see *Bowen v. Georgetown University Hospital,* 488 U.S. 204, 216–25, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988) (Scalia, J., concurring); *Bergerco Canada v. U.S. Treasury Department,* 129 F.3d 189, 192–93 (D.C.Cir.1997) (treating Justice Scalia's concurring opinion as substantially authoritative, though noting that "[t]he *Bowen* majority, to be sure, neither embraced nor rejected Justice Scalia's view"). To a large extent Celtronix invokes the criteria applied in *Landgraf v. USI Film Products,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), a case that explored the question of what sort of retroactivity was subject to the longstanding presumption against retroactive statutes. *Id.* at 263–80, 114 S.Ct. 1483. Here, of course, there is no issue of intent at all: the Commission indisputably intended its new grace period rule to apply to payment delays occurring after the rule's adoption but in connection with previously issued licenses. Nonetheless, the tests formulated in *Landgraf* are indeed pertinent to the APA issue. See, e.g., *Bergerco Canada,* 129 F.3d at 193; *DIRECTV v. FCC,* 110 F.3d 816, 825–26 (D.C.Cir.1997).

■ According to Justice Scalia, a retroactive rule forbidden by the APA is one which "alter[s] the *past* legal consequences of past actions." *Bowen,* 488 U.S. at 219, 109 S.Ct. 468. In *Landgraf,* the Court said that retroactivity occurred where a statute "would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." 511 U.S. at 280, 114 S.Ct. 1483.

■ It seems impossible to characterize the rule change here as "alter[ing] the past legal consequences" of a past action. It altered the *future* effect of the initial license issuance, to be sure, but that could not be viewed as "past legal consequences." Nor could the change be said to impair rights possessed by Celtronix when it acted, as it could have had no grace period rights before it "acted" to acquire the license, and any payment delay covered by the new rule, i.e., any delay not already excused, necessarily occurred after the rule change. If the rule could be viewed as "impos[ing] new duties" at all (in the sense of making the duty to pay installments more stringent), it would run afoul of *Landgraf's* concept *only* if it imposed them with regard to a "transaction[ ] already completed." That would be so if the "transaction" at issue were the issuance of the license itself, as Celtronix urges, rather than the delay in payments.

The examples used in the cases make clear that we should focus on the *payment delays* and not on initial *issuance* of the license. As Justice Scalia noted in *Landgraf,* a new ban on gambling would not involve retroactivity in its application to existing casinos (which presumably would have been *licensed* by a state), because the "relevant retroactivity event is the primary activity of gambling, not the primary activity of constructing casinos." *Landgraf,* 511 U.S. at 293 n. 3, 114 S.Ct. 1483 (Scalia, J., concurring). Similarly, Justice Scalia made clear in *Bowen* that there would be no violation of the APA's insistence on rules of "future effect" if the Secretary there had promulgated new reimburse-

ment formulas for future services, even though the hospitals in question were operating under longterm contracts negotiated in reliance on a prior, more generous rule. 488 U.S. at 220, 109 S.Ct. 468.

Celtronix claims to have had a "vested right" to keep requesting additional grace periods and to force the Commission to consider any unique circumstances. To this end, it cites *Landgraf*'s statement that the judicial clear statement rule would apply where a statute would otherwise "impair rights a party possessed when he acted." 511 U.S. at 280, 114 S.Ct. 1483.[2] But Celtronix never explains where this vested right came from. The pre-auction license system offered no vested right to any specific terms. Rather, it is undisputed that the Commission always retained the power to alter the term of existing licenses by rulemaking. See, e.g., *United States v. Storer Broadcasting Co.,* 351 U.S. 192, 205, 76 S.Ct. 763, 100 L.Ed. 1081 (1956); *National Broadcasting Co. v. United States,* 319 U.S. 190, 225, 63 S.Ct. 997, 87 L.Ed. 1344 (1943); *Committee for Effective Cellular Rules v. FCC,* 53 F.3d 1309, 1319–20 (D.C.Cir.1995); *WBEN, Inc. v. FCC,* 396 F.2d 601, 617–18 (2d Cir.1968).

The introduction of auctions made no change in this aspect of the licensing regime. In fact, Congress provided both that the Commission would retain its authority "to regulate or reclaim spectrum licenses," 47 U.S.C. § 309(j)(6)(C), and that nothing in the use of auctions would "be construed to convey any rights ... that differ from the rights that apply to other licenses...." *Id.* § 309(j)(6)(D).

Of course the grace period change may have altered the value of the rights Celtronix acquired by its winning bid and commitment to make the required payments. This sort of retroactivity—characteristic of a rule having exclusively "future effect" but affecting the desirability of past transactions—has become known as "secondary retroactivity." See *Bowen,* 488 U.S. at 219–20, 109 S.Ct. 468 (Scalia, J., concurring). Under our authority to set aside rules that are arbitrary and capricious, we review such rules to see whether they are reasonable, "both in substance *and in being made retroactive." U.S. Airwaves, Inc. v. FCC,* 232 F.3d 227, 233 (D.C.Cir. 2000) (emphasis added).

Here it's easy to find the rule reasonable in both respects. The Commission merely replaced the possibility of two (or maybe more) three-month grace periods, available only on a successful appeal to the Commission's discretion, with the assurance of two 90–day periods subject to 5% and 10% penalties on the delayed payments. Looking at licensees as a class, there is no reason to think the change disadvantageous. Indeed, the Commission described the change as a "liberalization." *Grace Period Order,* ¶ 108. Nor does Celtronix suggest that the rule change would inflict material injuries on any set of licencees (such as ones whose circumstances made receipt of Commission grace especially likely)˙ that would offset its beneficial effects, or indeed that the Commission has *ever* exercised its discretion favorably. Moreover, it seems utterly improbable that the old grace provisions could have induced reliance, either in the form of higher

---

**2.** The passage cited by Celtronix in fact makes no reference to "vested" rights, but other parts of the opinion do. See 511 U.S. at 268–69 & n. 23, 114 S.Ct. 1483 (quoting "vested rights" language from Justice Story's opinion in *Society for Propagation of the Gospel v. Wheeler,* 2 Gall. 105, 22 F. Cas. 756, 767, No.

13,156 (C.C.D.N.H.1814), and from *Sturges v. Carter,* 114 U.S. 511, 519, 5 S.Ct. 1014, 29 L.Ed. 240 (1885)); *id.* at 275 n. 29, 114 S.Ct. 1483; see also *id.* at 290–94, 114 S.Ct. 1483 (Scalia, J., concurring) (critiquing "vested rights" usage).

bids by licensees at the bidding stage (as the change is so trivial and likely beneficial), or of any different conduct thereafter (as both old and new rule provide substantially equal motivations to avoid default). See *Bergerco*, 129 F.3d at 195. In sum, when one considers both the interests of licensees generally and of the Commission, the rule change's harms (the amorphous injury to hypothetical successful pleaders for discretionary grace, and the penalty fees) seem outweighed by its benefits (the certainty and clarity for all concerned and the elimination of a possibly long and costly decisionmaking process under vague criteria). So, at least, the Commission could reasonably have concluded.

Celtronix also urges a somewhat makeshift argument that the FCC's rule change was a breach of contract, citing *United States v. Winstar Corp.*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). But there the government had contractually bound itself to bear the risk of specified regulatory change adverse to certain firms that had acquired failed saving and loan associations in reliance on that promise. *Id.* at 868–71, 116 S.Ct. 2432. Here, far from there being any such promise, there was, as we've noted, a long tradition of Commission authority to change rules governing already-issued licenses and congressional provision for the application of the prior understandings to licenses acquired by auction.

\*　　　\*　　　\*

The order of the Commission is

*Affirmed.*