**HARBOR INSURANCE COMPANY,**
Appellant

v.

**SCHNABEL FOUNDATION
COMPANY, INC., et al.**

No. 90–7122.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 6, 1991.

Decided Oct. 15, 1991.

Rehearing Denied Dec. 9, 1991.

---

Robert E. Heggestad, Washington, D.C., for appellant.

John C. Lynch, for appellees. Alexander W. Whitaker, Washington, D.C., also entered an appearance, for appellees.

Before EDWARDS, RUTH B. GINSBURG and SILBERMAN, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

This diversity action arises out of a construction dispute between OMNI Construction, Inc., and Schnabel Foundation Company, one of OMNI's subcontractors. Appellant Harbor Insurance, as subrogee of OMNI, appeals from the judgment below on three grounds. Harbor contends that the district court erred in denying its motion for summary judgment based on Schnabel's strict contractual liability. Appellant also objects to the district court's truncating of its cross-examination of Schnabel's principal expert witness. Last, Harbor argues that the district court improperly denied its motion for a directed verdict on the issue of contributory negligence. Because we believe that the record was inadequate to sustain a finding of contributory negligence by a reasonable jury, we agree with Harbor that the district court should have directed a verdict in its favor on the issue of contributory negligence. We accordingly remand for a new trial.

I.

Harbor and Schnabel are disputing who is financially responsible for damage caused to an office building owned by Sears, Roebuck & Company adjacent to a construction site at 601 Pennsylvania Avenue, N.W., in Washington, D.C. The Sears building was damaged when excavation and construction activities at the 601 site caused the ground on which the Sears building stands to subside, or settle.

Westminster Investing Corporation, the owner of the 601 project, hired OMNI as its general contractor. OMNI in turn retained several subcontractors to perform various aspects of the work required to get the 601 project underway. One of them, Schnabel, was the sheeting and shoring subcontractor, whose responsibility it was to design and implement a system for protecting the walls of the excavation. The other subcontractors relevant to this appeal are Division Two, Inc., the company responsible for dewatering the excavation, and Hutchison Brothers Excavating Company, Inc., the excavation subcontractor.

While making preparations for the 601 project, Westminster had hired Schnabel Engineering Associates (SEA), a geotechnical engineering firm separate from Schnabel Foundation, to prepare reports analyzing soil conditions at the site and to recommend, among other things, a design for the sheeting and shoring of the excavation. SEA recommended "interlocking solid-steel" sheeting and shoring for the wall of the excavation next to the Sears building, a stronger system than the soldier beam and wood lagging system SEA thought adequate for the other walls. SEA also recommended that two tiers of tiebacks be used to hold the sheeting and shoring adjacent to the Sears building in place and that the system be designed to an earth retention criterion of 46H for maximum stability.

Schnabel, when it designed its system, declined to follow SEA's recommendations. Instead, Schnabel told OMNI that it proposed to use a soldier beam and wood lagging system with one tier of tiebacks and an earth retention criterion of 30H for the wall adjacent to the Sears building. Sears, concerned about the possibility of settlement, retained its own engineering consultants to evaluate Schnabel's proposed system. In June 1984, Sears transmitted the reports of its consultants to Westminster, who passed them on to OMNI. Sears' consultants noted that Schnabel had not followed SEA's recommendations, expressed reservations about the wood lagging sys-

tem Schnabel had decided upon, and warned that the system could result in significant settlements.

OMNI had no design department, no engineers to do design work, and no internal capacity to undertake a technical review of sheeting and shoring recommendations. Accordingly, it sent these reports to Schnabel for its review. Schnabel responded by letter in July, disagreeing with the Sears consultants and declining to change its proposed sheeting and shoring system. Schnabel insisted to OMNI that "our system is the system required for this project and it will be installed in consideration of the Sears property."

Sheeting and shoring of the 601 excavation began several days later. Schnabel used the soldier pile and wood lagging system it had proposed, and other subcontractors began to perform their tasks, including lowering the water table at the site, placing wells, and sloping the walls of the excavation. Meanwhile, Westminster agreed to indemnify Sears for any damage caused as a result of the 601 construction, and OMNI reaffirmed in writing the obligation it had undertaken as part of the general contract to indemnify Westminster against such liability to Sears.

Unfortunately, within a month, routine monitoring of the Sears building revealed the first signs of settlement and damage. The earth had sunk slightly (about half an inch) and was moving slowly toward the excavation pit at 601 Pennsylvania Avenue. Cracks had appeared in the external walls of the Sears building. The settling continued at a steady but declining rate through the fall of 1984, and a second major settlement occurred during early November. To prevent the Sears building from collapsing, Schnabel was forced to install a system of steel braces to support the northeast corner of the building. Other remedial measures were considered, one of which was the elimination of a number of parking spaces on several levels of the 601 building, but Westminster declined to alter the garage plans. By early December, when Schnabel finished bracing the Sears building, the total settlement had reached two-and-one-half inches. After extensive negotiations, Sears, Westminster, and OMNI entered into an agreement pursuant to which OMNI performed repairs amounting to $978,000.

Harbor Insurance, OMNI's subrogee, then sued Schnabel and several other subcontractors under the law of the District of Columbia, claiming recovery under both negligence and contract theories. Harbor moved for summary judgment on the issue of Schnabel's contractual liability without fault. Harbor contended that Schnabel had agreed to assume all of OMNI's obligations to Westminster and that this included OMNI's obligation to indemnify Westminster against liability to Sears without fault. The district judge denied the motion, finding the contract documents ambiguous. *See Harbor Ins. Co. v. Leo A. Daly Co.*, Civ. No. 87–2211, *Mem.* at 10–11 (D.D.C. Nov. 3, 1989) (*"Mem. Op."*).

The case was then put to a jury, principally on a theory of professional negligence. Schnabel raised contributory negligence as an affirmative defense. The main witnesses on both sides were construction experts who attempted to explain why the settlements had occurred and who was to blame. Edward Cording, Schnabel's principal expert, testified that the wood lagging system Schnabel employed at the 601 site was similar to that used in other comparable sites in the area. Harbor attempted to impeach Cording's testimony on cross-examination by demonstrating that Cording had no personal knowledge of these other sites and that, in any event, they were not comparable to the 601 site. The district court, however, cut off the cross-examination on the ground that it would be too time-consuming relative to its value.

After both sides rested, Harbor moved for a directed verdict on the issue of contributory negligence, arguing that Schnabel had failed to introduce sufficient evidence to justify sending this issue to the jury. The district court denied the motion, and the jury returned a verdict in Schnabel's favor. We cannot tell whether the verdict was predicated upon Schnabel's non-negligence or upon OMNI's contrib-

utory negligence, because the district court had earlier declined Schnabel's motion to submit a special interrogatory to the jury to determine the basis of a verdict in its favor. Harbor did not make a timely motion for j.n.o.v. or a new trial, but instead appealed directly to this court.

## II.

### A.

■ Harbor first challenges the district court's denial of summary judgment on the issue of Schnabel's strict contractual liability. Harbor argues that the terms of the subcontract, when read in conjunction with certain provisions of the general contract, establish as a matter of law that Schnabel was bound to indemnify OMNI without regard to fault. This argument is based mainly on Article 1(b) of the subcontract, which states that "[S]ubcontractor shall assume all obligations, risks and responsibilities which OMNI has assumed towards Owner in the Contract Documents." Because OMNI assumed an obligation to indemnify Westminster without regard to fault for any property damage caused by OMNI or its subcontractors pursuant to Article 10.2.5 of the general contract, Harbor argues that Schnabel assumed the same obligation and must indemnify OMNI (and therefore Harbor) for the damage to the Sears building.

The district judge rejected this argument because he thought the contract documents were ambiguous concerning the nature of the responsibility the subcontractor owed the general contractor. *See Mem. Op.* at 6. Other provisions in the subcontract seemed to suggest that Schnabel was liable only for its negligence. The most important of these, Article 6(c), provided that Schnabel holds OMNI harmless for any property damage that is the result "in whole or in part, of negligence (or other act for which

there is legal liability) of Subcontractor." The district court noted that "[a]ll of the sections of the [general] contract and subcontract which refer specifically to liability speak of negligence." *Mem. Op.* at 6. The court further observed that Harbor's reading of the contract documents would make Schnabel liable for damage even if caused by Westminster's own negligence, a result generally not permitted unless language in the contract unmistakably authorizes it. See *United States v. Seckinger*, 397 U.S. 203, 211–12, 90 S.Ct. 880, 885, 25 L.Ed.2d 224 (1970). Accordingly, the district court determined that even if it were ultimately to find that the contract documents imposed strict liability on Schnabel, the contracts were sufficiently ambiguous to prevent it from making that finding on summary judgment. *See Mem. Op.* at 10–11.

We agree with the district court that summary judgment for Harbor on this issue would have been inappropriate. At minimum, the contracts were ambiguous.[1] In addition to the *Seckinger* rule of construction, we note that Article 1(b) of the subcontract was included at the insistence of the owner, not the general contractor. This provision would appear to have been intended to provide additional protection to Westminster, not to alter the allocation of liability between the subcontractor and the general. Article 6(c) of the subcontract seems to make negligence the key to that allocation.

Even if the contracts had been clear in imposing strict liability on Schnabel, moreover, summary judgment would still not seem justified. A finding of strict liability can never be made without proof of causation. No matter how strict the liability, Schnabel presumably would not have been liable had the settlement occurred due to an earthquake. Causation was an intensely disputed issue of material fact in the case, so summary judgment appears im-

---

1. As we have previously held, if a contract is facially ambiguous but extrinsic evidence as to the meaning of the ambiguous term demonstrates only one view is reasonable, a district judge may grant summary judgment. *See Farmland Indus. v. Grain Bd.*, 904 F.2d 732, 736 (D.C.Cir.1990). Otherwise, the resolution of the ambiguity under District of Columbia law is for the trier of fact. *See id.; Howard University v. Best*, 484 A.2d 958, 966–67 (D.C.1984). Appellant has not objected, however, to the manner in which the ambiguity was resolved; indeed, it is not clear to us whether it was ultimately decided by the judge or the jury.

proper even on Harbor's reading of the contract.

## B.

■ Harbor's second contention—that the district court abused its discretion in cutting off cross-examination of Schnabel's principal expert witness—is more troubling. The district court enjoys wide discretion to control cross-examination. It may disallow cross-examination that is repetitive, irrelevant, unduly prejudicial, collateral to the issues in the trial, or outside the scope of direct examination. *See, e.g., United States v. Kinnard,* 465 F.2d 566, 582 (D.C.Cir.1972). But the district court's discretion is not unlimited. Particularly where a party is seeking to impeach a witness whose credibility could have an important influence on the outcome of the trial, the district court should be cautious in limiting cross-examination. *See, e.g., United States v. Pryce,* 938 F.2d 1343, 1345 (D.C.Cir.1991).

■ Here, the district court cut off cross-examination of Schnabel's principal expert witness, who testified that in his opinion Schnabel's wood lagging system satisfied the applicable standard of care. The purpose of the cross-examination was to show that Cording lacked personal knowledge of the sites he had described as comparable to the 601 project—an issue directly relevant to the weight the jury would assign to his testimony. The issue was not collateral, irrelevant, or prejudicial. The only reason given by the district court for disallowing the cross-examination was that it would be tedious and time-consuming to go through each site Cording had listed as comparable to the 601 site. That may have been so, but Harbor was entitled to pursue the line of cross-examination, and it was an abuse of discretion to prevent Harbor from proceeding.

We will reverse the district court, however, only where an incorrect decision to limit cross-examination results in prejudice to the substantial rights of the appellant. *See* Fed.R.Civ.P. 61; 28 U.S.C. § 2111. Given our disposition of Harbor's final claim, we need not reach that issue.

## C.

Harbor's last argument is that the district court improperly denied its motion for a directed verdict on the issue of contributory negligence. We agree. At the close of Schnabel's evidence, no reasonable jury, in our view, could have found that either Westminster or OMNI (in whose shoes Harbor stands) was contributorily negligent.

■ In reviewing the denial of a directed verdict, the standard we apply is the same as that applied by a district court considering the motion in the first instance. Viewing the evidence in the light most favorable to the non-moving party, we must ask ourselves whether any reasonable jury could find in its favor. *See Klein v. District of Columbia,* 409 F.2d 164, 167 (D.C.Cir.1969). We are entitled to consider all uncontradicted evidence offered by the moving party, as well as all evidence introduced by the non-moving party. And we must draw all reasonable inferences favorable to the party against whom the directed verdict motion has been made. *See Ealy v. Richardson–Merrell, Inc.,* 897 F.2d 1159, 1161 (D.C.Cir.1990). But a jury is entitled to draw only those inferences that are legitimate and reasonable; the court should direct a verdict where, in order to reach a verdict favorable to the non-moving party, the jury would be required to speculate or to rely on mere conjecture. *See Capital Transit Co., Inc. v. Gamble,* 160 F.2d 283, 284–85 (D.C.Cir.1947). There must be sufficient facts and testimony in the record from which a jury could reasonably draw the inferences we attribute to it. A scintilla of evidence is not enough. *See Wilson v. Good Humor Corp.,* 757 F.2d 1293, 1298 (D.C.Cir.1985).

■ Schnabel argues, however, that in the circumstances presented, a more stringent standard of review is required under *Jones v. Reliance Ins. Co.,* 607 F.2d 1 (D.C.Cir.1979) (per curiam). *Jones* held that where a party moves for directed verdict but fails to make a timely motion for judgment notwithstanding the verdict after

the trial, "the District Court's refusal to direct a verdict is ground for a new trial only if the record reveals a complete absence of evidence to support a jury's verdict." *Id.* at 4. Because Harbor did not make a timely j.n.o.v. motion, Schnabel insists that we must apply that "complete absence of evidence" standard to the district court's denial of Harbor's directed verdict motion.

We disagree. It is not at all clear that *Jones* applies to these facts. Although the *Jones* court gave no reasons for its decision, it would seem that the rule's principal purpose is to conserve judicial resources. Where a party has failed to move for j.n.o.v., an appellate court may not, in reversing the denial of a directed verdict, enter judgment; relief is limited to ordering a new trial. *See Johnson v. New York, N.H. & H.R.R.*, 344 U.S. 48, 73 S.Ct. 125, 97 L.Ed. 77 (1952). The *Jones* court presumably wished to provide the maximum possible incentive for a party to move for j.n.o.v., so that the appellate court could avoid ordering a new trial and instead simply enter judgment if it decided that a directed verdict should have been granted. In this case, however, Harbor could not have moved for j.n.o.v. It had only moved for a *partial* directed verdict, designed to deprive Schnabel of the defense of contributory negligence; it had not sought to have a final judgment entered in its favor.[2] Harbor could not, therefore, have renewed its motion for the court to decide the issue of contributory negligence after the jury returned its verdict—such a motion would have been pointless.

Still, *Jones* could be construed to include a party's failure to make a timely new trial motion as well. *See id.* at 3. Although providing the additional incentive to move for a new trial would not save the judicial resources required to retry the case, it would at least give the district court the opportunity to correct the alleged defect in

the first instance and might therefore conserve appellate resources. Because Harbor failed to make a timely new trial motion, *Jones'* reasoning might be thought to apply here.

We decline to follow that logic, however, because we think *Jones* was wrongly decided. It stands against the vast weight of authority concerning the appropriate standard of appellate review of directed verdict motions. *See* 9 C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2524 at 543 & cases cited in nn. 30–31 (1971 & Supp. 1991) ("The question is not whether there is literally no evidence supporting the party against whom the motion is directed...."). The Federal Rules of Civil Procedure contain only a single standard for evaluating a motion for a directed verdict and provide no indication that a reviewing court may review under different standards a directed verdict motion that is followed by a motion for j.n.o.v. and one that is not. *See* FED. R.CIV.P. 50. Such a distinction gives rise to several anomalies. The *Jones* rule creates a *de facto* disparity between our standard of review for directed verdict motions and j.n.o.v. motions, a disparity that seems especially unjustified in light of the recent change in the Federal Rules eliminating the difference in terminology between the two. *See id.* (calling both "motion[s] for judgment as a matter of law"); *see also* C. WRIGHT & A. MILLER § 2524 at 541–42 (standard for directed verdict is the same as that for j.n.o.v.). And it in effect denies plenary review of an issue of law to a litigant who fails to make post-trial motions, even though such motions are nowhere made a condition of securing effective appellate review. *See id.* § 2536 at 595 (on directed verdict questions, "litigants are entitled to full review by the appellate court without special deference to the views of the trial court").[3] To the extent, then, that *Jones* mandates more limited appellate review of the denial of a

---

**2.** Harbor did not move the district court to direct a verdict against Schnabel, because, as Harbor candidly admitted, it could not have done so in good faith given the room for reasonable disagreement concerning Schnabel's negligence.

**3.** Furthermore, we doubt the need to add incentives to a party's obvious interest in avoiding the cost of an appeal.

directed verdict motion when the movant fails to move for post-verdict relief from the district court, it is hereby overruled.[4]

■ Applying the traditional "reasonable jury" standard, we do not think the record supports a contributory negligence finding. Schnabel argued before the jury, and reiterates before us, that either Westminster, OMNI, or both were contributorily negligent. Westminster's negligence is said to be based on its refusal to eliminate underground parking spaces and its decision to site its building only 27 feet from the neighboring Sears building. The question of eliminating the parking spaces did not arise, however, until after the two main settlements that caused the damage had already occurred. Whatever the wisdom of Westminster's decision, it could not have been the proximate cause of the damage—the horse was already out of the barn.

As for the siting decision, even assuming that a jury could infer that placing the new construction 27 feet from the Sears building was in some sense a cause of the settlement (we suppose it could be said that the settlement would not have occurred if the new construction were 100 feet away or on the next block), Schnabel produced no evidence that choosing 27 feet as the distance between the two buildings was unreasonable and therefore breached Westminster's duty of care. Schnabel's own expert testified, in fact, that the distance chosen was reasonable, although siting the building further away "would be even better." Transcript (Tr.) at 711. No doubt—in hindsight. But that is simply not evidence of negligence.

Moreover, it is hard to imagine how one could conclude that 27 feet would be too close to the Sears building to permit construction without regard to the type of sheeting and shoring utilized by Schnabel. If the siting was too close for the system Schnabel employed, the *proximate* cause of the settlement would not be the siting distance but instead the shoring techniques Schnabel used. After all, Schnabel worked within design parameters that included the 27 foot distance.

■ Schnabel also argues that the jury could reasonably have found that OMNI was negligent. Here again, Schnabel puts forth two theories. The first, which we think quite striking, is that OMNI was negligent in relying on Schnabel's own decision to use a wood lagging rather than a steel shoring system on the excavation wall adjacent to the Sears building. OMNI, we are told by Schnabel, should not have listened to Schnabel. It is certainly somewhat unorthodox for one party to a lawsuit to assert that the second party was negligent for relying on the first party.[5] The law of the District of Columbia governs in this diversity action, and the District of Columbia Court of Appeals recently held that "as a matter of law" an architect could not be found contributorily negligent for relying on the product of the surveyor he had hired. *Bell v. Jones*, 523 A.2d 982, 997 (D.C.App.1986). We take the D.C. Court of Appeals to imply that something of an estoppel arises when a party engages an expert and relies on the expert's advice or services. In those circumstances, if the contracting party or his subrogee sues the expert for negligence, the expert cannot blithely turn around and claim that the contracting party was negligent in retaining or listening to the expert. We think that must be so at least where the contracting party is clearly relying on the expert's special knowledge or capability.

Here, the record indicates that OMNI's unvarying practice was to rely completely on its subcontractors' expertise regarding sheeting and shoring systems. OMNI employs no architects, engineers, or designers and undertakes no technical review of sheeting and shoring systems. And any concerns third parties express over the

---

4. This opinion has been approved by the entire court and thus constitutes the law of this circuit. *See Irons v. Diamond,* 670 F.2d 265, 268 n. 11 (D.C.Cir.1981).

5. It reminds us of the legal definition of chutzpah: chutzpah is a young man, convicted of murdering his parents, who argues for mercy on the ground that he is an orphan. *Cf. Northwest Airlines, Inc. v. Air Line Pilots Ass'n, Int'l,* 808 F.2d 76, 83 (D.C.Cir.1987).

soundness of sheeting and shoring systems are referred to the subcontractor.

To be sure, engineering consultants advised OMNI that Schnabel's proposed system was inadequate and recommended the steel system instead, but OMNI, after consulting Schnabel, who disagreed with the consultants, relied on Schnabel. And Schnabel has produced no evidence that would even suggest that OMNI, unlike the architect in *Bell v. Jones*, should not have relied on the expert with whom it had contracted. Indeed, the only testimony on this point, presented by Schnabel's own witness, was to the effect that it was standard industry practice, and therefore presumptively reasonable, for a general contractor to rely on its subcontractors and that it was reasonable for OMNI to have relied on Schnabel's plans.

■ Schnabel's second theory is that OMNI was contributorily negligent in failing to supervise adequately other subcontractors whose work may have contributed to the damage. In particular, Schnabel cites Division Two's placement of a dewatering well and the demolition and sloping of the excavation by Hutchison Brothers. We have reviewed in detail all of the evidence of OMNI's supposed contributory negligence that Schnabel cited in its brief or at oral argument, but none of it is sufficient to raise an issue for the jury. The critical defect in the evidence is that none of it establishes or defines OMNI's duty of care with respect to the work of other subcontractors or demonstrates the breach of that duty. Most of the testimony relied on by Schnabel tends only to show that dewatering and excavation were contributing causes of the settlement. Even if a reasonable jury could have found that dewatering was, along with excavation, one of the proximate causes of the settlement—and the state of this proof is itself somewhat tenuous—this evidence would be insufficient as a matter of law to permit a finding that OMNI was contributorily negligent.

To be sure, as Schnabel emphasizes, OMNI, as the general contractor, did have authority to direct the subcontractors. But that the general supervises the subs is wholly insufficient to prove that the general did so in a negligent manner. Schnabel's expert, Cording, testified that "coordinating the work of the subcontractors ... and in deciding of things such as the wells ... are basically OMNI's responsibility." Tr. at 750. But no reasonable jury could have concluded that this meant that Cording felt OMNI had been negligent in siting the well; only a few questions earlier, he had testified, "I find it very difficult to go back after the fact and say: you should have done this. I think that decisions that were being made throughout the project by engineers and the contractor were reasonable decisions...." Tr. at 749. Even OMNI's outside expert deferred to Division Two's judgment about the location of the well, leaving OMNI with no grounds at all for questioning that judgment.

In sum, the record is devoid of evidence sufficient to warrant a finding of contributory negligence by a reasonable jury. Accordingly, we reverse and remand for a new trial.

*It is so ordered.*