# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued September 24, 2010        Decided March 29, 2011

No. 09-5196

EMPRESA CUBANA EXPORTADORA DE ALIMENTOS Y
PRODUCTOS VARIOS, DOING BUSINESS AS CUBAEXPORT,
APPELLANT

v.

UNITED STATES DEPARTMENT OF THE TREASURY, OFFICE OF
FOREIGN ASSETS CONTROL, ET AL.,
APPELLEES

Appeals from the United States District Court
for the District of Columbia
(No. 1:06-cv-01692)

*David H. Bernstein* argued the cause for appellant. With
him on the briefs were *Carl Micarelli* and *Peter M. Brody*.

*Jonathan H. Levy*, Attorney, U.S. Department of Justice,
argued the cause for appellees. With him on the brief were
*Tony West*, Assistant Attorney General, U.S. Department of
Justice, *Ronald C. Machen*, *Jr.*, U.S. Attorney, and *Douglas
N. Letter*, Attorney, U.S. Department of Justice.

Before: KAVANAUGH, *Circuit Judge*, and EDWARDS and
SILBERMAN, *Senior Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* KAVANAUGH, with whom *Senior Circuit Judge* EDWARDS joins.

Dissenting opinion filed by *Senior Circuit Judge* SILBERMAN.

KAVANAUGH, *Circuit Judge*: First enacted in 1917, the Trading with the Enemy Act authorizes the President, under specified conditions, to impose embargoes on trade with foreign nations. In 1963, acting pursuant to that statute, President Kennedy directed the Department of the Treasury to issue the Cuban Assets Control Regulations. Those regulations prohibit most transactions between American and Cuban persons. The regulations authorize the Secretary of the Treasury to make certain exceptions to the embargo, but the regulations state that any such exceptions "may be amended, modified, or revoked at any time."

As issued in 1963, the Treasury regulations contained an exception allowing Cuban-affiliated entities to register and renew U.S. trademarks. In 1976, acting under that exception, a Cuban corporation known as Cubaexport registered the trademark HAVANA CLUB with the U.S. Patent and Trademark Office. In 1996, one of Cubaexport's subsidiaries renewed the trademark. But in 1998, Congress modified the exception to the Cuban Assets Control Regulations that had allowed Cubaexport to register and renew its HAVANA CLUB trademark. The 1998 law barred renewals of certain trademarks, including Cubaexport's. As a result, the Department of the Treasury's Office of Foreign Assets Control prohibited Cubaexport from renewing its trademark when the trademark again came due for renewal in 2006.

In this Court, Cubaexport invokes the presumption against retroactivity and argues that the 1998 law should be interpreted to bar only new trademark registrations, not renewals of previously registered trademarks. Cubaexport also contends that, if the 1998 law does bar renewal of previously registered trademarks, then it violates the substantive due process doctrine. We disagree with both arguments. Because the Cuban Assets Control Regulations stated that exceptions were revocable at any time, Cubaexport had no vested right to perpetual renewal of the trademark. Therefore, the presumption against retroactivity does not apply, and we must interpret the 1998 law according to its terms – namely, to bar both new registrations and renewals of previously registered trademarks. Moreover, the 1998 legislation readily satisfies the deferential substantive due process test. Cubaexport raises several other contentions, but they likewise are without merit. We therefore affirm the District Court's judgment against Cubaexport.

I

The Trading with the Enemy Act of 1917 authorizes the President to impose comprehensive economic sanctions on foreign nations in certain circumstances. *See* 50 U.S.C. app. § 5(b).[1] In 1963, pursuant to that Act and President Kennedy's order, the Department of the Treasury issued the Cuban Assets Control Regulations, 31 C.F.R. Part 515. Those regulations prohibit, among other things, transactions by "any

---

[1] As enacted in 1917, the Act authorized sanctions in war and peacetime national emergencies. In 1977, Congress amended the Act so that it no longer applies to peacetime emergencies. But Congress grandfathered the embargo against Cuba, allowing its extension by presidential declaration. *See* Pub. L. No. 95-223, § 101, 91 Stat. 1625 (codified as note following 50 U.S.C. app. § 5); *see generally Regan v. Wald*, 468 U.S. 222, 226-29 (1984).

person subject to the jurisdiction of the United States" involving property in which Cuba or any Cuban national has "any interest of any nature whatsoever, direct or indirect." 31 C.F.R. § 515.201.

Under the regulations, exceptions may be "specifically authorized by the Secretary of the Treasury (or any person, agency, or instrumentality designated by him)." *Id.* Such exceptions may take two forms: A so-called "general license" is a general exception written into the Treasury regulations themselves. A "specific license" is an exception made by the Department of the Treasury for a specific applicant. *Id.* §§ 501.801, 515.316-.318.

Under the regulations, exceptions are not forever. Since 1963, the regulations have cautioned that any exception to the trade embargo "may be amended, modified, or revoked at any time." *See* 28 Fed. Reg. 6974, 6985 (July 9, 1963); *see also* 31 C.F.R. § 501.803.

This case involves trademarks. As issued in 1963, the Cuban Assets Control Regulations contained an exception allowing Cuban-affiliated entities to register and renew U.S. trademarks. *See* 28 Fed. Reg. 6974, 6982 (July 9, 1963).

In 1974, Cubaexport – a company owned by the Cuban government – applied to the U.S. Patent and Trademark Office to register the trademark HAVANA CLUB for the sale of rum. In 1976, as a result of the regulatory exception allowing Cuban companies to register U.S. trademarks, the U.S. Patent and Trademark Office approved Cubaexport's application. In 1996, one of Cubaexport's subsidiaries renewed the trademark pursuant to that same exception to the Cuban Assets Control Regulations.

5

In 1998, however, Congress passed and President Clinton signed a law eliminating the ability of Cuban companies to register or renew certain trademarks. *See* Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999, Pub. L. No. 105-277, § 211(a)(1), 112 Stat. 2681. That Act provides:

> Notwithstanding any other provision of law, no transaction or payment shall be authorized or approved pursuant to section 515.527 of title 31, Code of Federal Regulations, as in effect on September 9, 1998, with respect to a mark, trade name, or commercial name that is the same as or substantially similar to a mark, trade name, or commercial name that was used in connection with a business or assets that were confiscated unless the original owner of the mark, trade name, or commercial name, or the bona fide successor-in-interest has expressly consented.

As of September 9, 1998, 31 C.F.R. § 515.527 stated:

> Transactions related to the *registration and renewal* in the United States Patent and Trademark Office or the United States Copyright Office of patents, trademarks, and copyrights in which the Government of Cuba or a Cuban national has an interest are authorized.

§ 515.527(a) (emphasis added). Thus, because of the 1998 Act and its reference to 31 C.F.R. § 515.527, Cubaexport's trademark no longer fit within the regulatory exception for trademarks that had existed since 1963.[2] The new law

---

[2] The 1998 Act applies to marks used in connection with a business or assets that were "confiscated." That description covers the HAVANA CLUB mark. In 1960, Cuba's Communist

therefore posed a problem for Cubaexport when the HAVANA CLUB trademark came due for renewal in 2006 and Cubaexport tried to renew the mark. The Department of the Treasury's Office of Foreign Assets Control, known as OFAC, informed Cubaexport's counsel that the company was legally barred from paying the fee required to renew the trademark.

Cubaexport then filed suit. Cubaexport contended that the 1998 Act violated the substantive due process doctrine. Cubaexport further asserted that OFAC's decision contravened the procedural requirements of the Due Process Clause and the Administrative Procedure Act, and that OFAC's decisions were arbitrary and capricious under the Administrative Procedure Act. The District Court rejected each claim and granted summary judgment to the Government. We review the District Court's decision of those questions of law de novo.

II

To begin, we think it clear that the 1998 Act bars not just registration of new trademarks but also renewals of previously registered trademarks. The Act specifically applies to "transactions" and "payments." A renewal is both. A trademark renewal is a transaction. *See* THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (3d ed. 1996) (transaction is "[s]omething transacted, especially a

---

government confiscated the businesses and facilities owned by the distiller José Arechabala, S.A. Among the company's assets at that time were several U.S. trademark registrations for the rum brand HAVANA CLUB. By 1974, those registrations had expired, at which point Cubaexport registered the HAVANA CLUB mark as its own. *See Havana Club Holding, S.A. v. Galleon S.A.*, 203 F.3d 116, 127-30 (2d Cir. 2000).

business agreement or exchange" and to transact is to "do, carry on, or conduct: transact business over the phone; transacting trade agreements"). And a trademark renewal requires a payment. *See* 15 U.S.C. § 1059 (requiring payment of fee to renew trademark).

Even more to the point, the 1998 Act specifically cross-references "section 515.527 of title 31, Code of Federal Regulations, as in effect on September 9, 1998." The regulation at 31 C.F.R. § 515.527 expressly listed both registrations and renewals as "transactions."

Therefore, by its terms, the 1998 Act plainly bars both new trademark registrations and renewals of previously registered trademarks. As a result of the 1998 Act, Cubaexport was prohibited from renewing its HAVANA CLUB trademark when it tried to do so in 2006. Invoking the presumption against retroactivity, Cubaexport argues that the 1998 Act bars only the new registration of trademarks, not the renewal of previously registered marks such as Cubaexport's. Alternatively, Cubaexport contends that the 1998 Act contravenes the substantive due process doctrine. We disagree with both arguments.

A

Under the branch of the presumption against retroactivity doctrine that is relevant here, a statute is interpreted not to have retroactive effect if (i) the statute does not clearly specify its temporal scope[3] and (ii) applying the statute

---

[3] The precedents are murky as to how precise a statute's temporal reach must be in order to overcome the presumption against retroactivity. The Supreme Court has sometimes required an "express command" – akin to a clear statement – for a statute to have retroactive effect. *Landgraf v. USI Film Products*, 511 U.S.

retroactively would affect a party's vested rights. *See Fernandez-Vargas v. Gonzalez*, 548 U.S. 30, 37 (2006).[4] Cubaexport contends that it acquired a vested right to renewal of the HAVANA CLUB trademark when it first registered the mark in 1976. It argues that the 1998 Act therefore should be

244, 280 (1994). However, the Court more recently added that "in the absence of language as helpful as that we try to draw a comparably firm conclusion about the temporal reach specifically intended by applying 'our normal rules of construction.'" *Fernandez-Vargas v. Gonzalez*, 548 U.S. 30, 37 (2006) (quoting *Lindh v. Murphy*, 521 U.S. 320, 326 (1997)). We need not determine here how clear a statute must be to override the presumption against retroactivity (and in turn whether the language of the 1998 Act suffices to meet that standard) because, as we explain below, Cubaexport's lack of a vested right means the presumption does not apply in any event in this case. *Cf. Fernandez-Vargas*, 548 U.S. at 41, 42-47 (statute lacks requisite "clear statement" to apply retroactively, but presumption does not apply because statute has no retroactive effect).

[4] The presumption against retroactivity also applies when a statute would "increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Id.* at 37 (quoting *Landgraf*, 511 U.S. at 280). We do not understand Cubaexport to advance an argument under that branch of the retroactivity doctrine. Nor could it. The 1998 Act did not increase Cubaexport's liability or impose any new duties with respect to past conduct or completed transactions. For example, a hypothetical 1998 law that required Cubaexport to pay $10,000 for its 1976 trademark registration would impose new liabilities or duties for purposes of that branch of the retroactivity doctrine. The actual 1998 Act at issue here, however, did not increase Cubaexport's liability or require Cubaexport to do anything. Rather, it merely prevented Cubaexport from renewing a trademark that was subject to the Cuban Assets Control Regulations. The relevant retroactivity question is whether the 1998 Act deprived Cubaexport of a vested right to renew such a trademark**.** It did not, as we explain in the text.

construed (notwithstanding its text) to bar only new registrations, not renewals of marks that were first registered before 1998.

The key question in this case with respect to the presumption against retroactivity is whether, as of 1998, Cubaexport possessed a vested right to renewal of the trademark. We think not. Even assuming that most trademark registrants acquire a perpetual right to renew their marks when they first register them, *cf. Ewing v. Standard Oil Co.*, 42 App. D.C. 321, 324 (D.C. Cir. 1914), Cubaexport did not. The Cuban Assets Control Regulations – which generally bar U.S. transactions involving Cuban-owned companies – have been in effect since 1963. When Cubaexport first registered its mark in 1976, the regulations contained an exception allowing trademark registrations and renewals. But the regulations also specified that any such exception "may be amended, modified, or revoked at any time." 28 Fed. Reg. 6974, 6985 (July 9, 1963).

Because Cubaexport's right to renew the trademark was expressly revocable at any time, Cubaexport did not obtain a vested right to perpetual renewal of the HAVANA CLUB trademark when it registered the mark in 1976. *See Fernandez-Vargas*, 548 U.S. at 45 (presumption of retroactivity does not apply where party "had an ample warning" of change in law); *Dames & Moore v. Regan*, 453 U.S. 654, 673 n.6 (1981) (no protected property interest if contingent on revocable exception to embargo regulations). Before 1998, Cubaexport perhaps had an expectation that it would be able to renew its trademark if the regulatory exception was not revoked. But it did not have a vested right. And a law that merely "upsets expectations based in prior law" – such as the 1998 statute at issue here – does not trigger

the presumption against retroactivity. *Landgraf v. USI Film Products*, 511 U.S. 244, 269 (1994).

Contrary to the suggestion of the dissent, we do not purport to do anything novel when we refer to a "vested right." We simply apply the Supreme Court's precedents, which have consistently used the term "vested right" in considering this branch of the presumption against retroactivity doctrine. *See, e.g.*, *Fernandez-Vargas*, 548 U.S. at 37 ("The modern law thus follows Justice Story's definition of a retroactive statute, as 'taking away or impairing vested rights . . . .'") (alterations omitted); *Republic of Austria v. Altmann*, 541 U.S. 677, 693 (2004) ("retroactive statutes may upset settled expectations by taking away or impairing vested rights acquired under existing laws") (internal quotation marks and alterations omitted); *INS v. St. Cyr*, 533 U.S. 289, 321 (2001) ("A statute has retroactive effect when it takes away or impairs vested rights acquired under existing laws . . . .") (internal quotation marks omitted); *Landgraf*, 511 U.S. at 269 ("[E]very statute, which takes away or impairs vested rights acquired under existing laws . . . must be deemed retrospective."); *id.* at 274 (no retroactivity found in prior case because "plaintiff had no 'vested right'"). Adhering to the Supreme Court's precedents, this Court has likewise repeatedly referred to vested rights in retroactivity cases. *See, e.g.*, *Arkema Inc. v. EPA*, 618 F.3d 1, 7 (D.C. Cir. 2010) ("A rule operates retroactively if it takes away or impairs vested rights."); *Marrie v. SEC*, 374 F.3d 1196, 1207 (D.C. Cir. 2004) ("a rule is retroactive if it takes away or impairs vested rights") (internal quotation marks omitted); *Celtronix Telemetry, Inc. v. FCC*, 272 F.3d 585, 589 (D.C. Cir. 2001) (no retroactivity under *Landgraf* because plaintiff had "no vested right" in previous licensing regime given that "the Commission always retained the power to alter the term of existing licenses by rulemaking").

The dissent says: "Whether OFAC could revoke" Cubaexport's "right – and under what conditions – is quite beside the point." Dissenting Op. at 3. We disagree. We think the Government's longstanding authority to revoke Cubaexport's right to renewal is exactly the point. In our judgment, the Government's express and longstanding revocation authority devastates Cubaexport's argument that it somehow had a "vested right" to perpetual renewal of the trademark.[5]

Because Cubaexport did not possess a vested right to renewal of the trademark, the presumption against retroactivity does not apply in this case. We therefore interpret the 1998 Act according to its ordinary meaning. By its plain terms, the Act bars both new registrations and renewals of marks (such as Cubaexport's) that were first

---

[5] The dissent also relies on a Second Circuit case interpreting a different provision of the 1998 Act, a provision barring Cuban trademark holders from obtaining injunctive relief to enforce certain trademarks. But our approach is consistent with that of the Second Circuit. That court stated that the 1998 Act may lack sufficient precision to overcome the presumption against retroactivity, but it ultimately declined to decide that issue or apply the presumption against retroactivity because, under the Supreme Court's analysis in *Landgraf*, "application of the new provision [was] not retroactive." *Havana Club Holding, S.A. v. Galleon S.A.*, 203 F.3d 116, 128-29 (2d Cir. 2000) (quoting *Landgraf*, 511 U.S. at 273). In the portion of *Landgraf* relied on by the Second Circuit, the Supreme Court explained that "relief by injunction operates *in futuro*," and thus a "plaintiff had no *vested right*" to such relief. *Landgraf*, 511 U.S. at 273-74 (internal quotation marks omitted and second emphasis added). As in the Second Circuit case, Cubaexport's lack of a vested right here means we need not reach the question whether the 1998 Act is so clear as to overcome the presumption against retroactivity. *See supra* note 3.

registered before 1998.  *See Fernandez-Vargas*, 548 U.S. at 42-47.

B

According to Cubaexport, if the 1998 Act bars renewal of previously registered trademarks, then the statute violates the substantive due process doctrine.

Cubaexport's argument rests on an inflated conception of substantive due process.  Unless legislation infringes a fundamental right, judicial scrutiny under the substantive due process doctrine is highly deferential.  *See Washington v. Glucksberg*, 521 U.S. 702, 720-22 (1997).  This case does not involve a fundamental right – and Cubaexport does not claim otherwise.  Therefore, under the Supreme Court's precedents, we ask only whether the legislation is rationally related to a legitimate government interest.  *See United States v. Carlton*, 512 U.S. 26, 30-31 (1994); *FCC v. Beach Communications, Inc.,* 508 U.S. 307, 313-15 (1993); *Ferguson v. Skrupa*, 372 U.S. 726 (1963); *Williamson v. Lee Optical, Inc.*, 348 U.S. 483 (1955); *see also Lochner v. New York*, 198 U.S. 45, 74-76 (1905) (Holmes, J., dissenting).

If a statute applies retroactively – for example, when a statute imposes new duties or liabilities for past acts – the "retroactive aspects of legislation, as well as the prospective aspects, must meet the test of due process, and the justifications for the latter may not suffice for the former.  But that burden is met simply by showing that the retroactive application of the legislation is itself justified by a rational legislative purpose."  *Carlton*, 512 U.S. at 31 (quoting *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 729-30 (1984)) (alterations omitted); *see also Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 16-17 (1976); *cf.*

*Eastern Enterprises v. Apfel*, 524 U.S. 498, 547-50 (1998) (Kennedy, J., concurring).

The deferential substantive due process test is easily satisfied here. The 1998 Act is rationally related to the legitimate government goals of isolating Cuba's Communist government and hastening a transition to democracy in Cuba. *See* Memorandum from Paul Simons, Deputy Assistant Secretary of State (July 28, 2006), Joint Appendix 85-86. The Act reinforces the Castro regime's isolation by denying Cuban-affiliated entities the use of U.S. trademarks related to businesses and assets confiscated by the Cuban government. And by barring renewal of trademarks that had previously been registered (not just new registrations), the 1998 Act applies to a greater number of such trademarks. Moreover, any unfairness that otherwise might arise from applying the 1998 Act to renewals is mitigated – indeed, eliminated – by the fact that the Cuban Assets Control Regulations had clearly warned that exceptions for trademarks were revocable at any time. *Cf. Eastern Enterprises*, 524 U.S. at 549-50 (Kennedy, J., concurring). Therefore, for purposes of the substantive due process doctrine, the 1998 Act – both in its substance and its application to renewal of pre-1998 trademarks – is rationally related to a legitimate government interest.[6]

Because the 1998 Act is clear and because Cubaexport's constitutional claim fails, we are likewise unpersuaded by Cubaexport's constitutional avoidance argument – namely, that, in order to avoid a serious constitutional question, we should construe the 1998 law to apply only to those marks

---

[6] The Government separately argues that Cubaexport has no substantive due process rights because it is a foreign national without a substantial connection to the United States. Because we reject Cubaexport's substantive due process argument on other grounds, we need not consider that contention.

first registered after 1998. A clear statute and a weak constitutional claim are not a recipe for successful invocation of the constitutional avoidance canon. *See Clark v. Martinez*, 543 U.S. 371, 381 (2005) (requiring "competing plausible interpretations of a statutory text" and "serious constitutional doubts" to apply the canon).

III

Cubaexport also argues that it was entitled under the Administrative Procedure Act to notice and an opportunity to be heard before the Department of the Treasury's Office of Foreign Assets Control determined that Cubaexport could not renew the HAVANA CLUB trademark. *See* 5 U.S.C. § 558(c). But Cubaexport in fact received notice and an opportunity to be heard – and was heard – prior to the agency's final determination.

After enactment of the 1998 law, Cubaexport's trademark next came up for renewal in 2006. Because of the 1998 statute, Cubaexport could no longer rely on the regulatory exception (known as the "general license") for trademarks. In a letter dated April 6, 2006, OFAC thus notified Cubaexport that the company would need an individualized exception from OFAC (known as a "specific license") in order to renew the HAVANA CLUB trademark with the U.S. Patent and Trademark Office. The OFAC letter invited Cubaexport to communicate with OFAC in writing or by telephone. Cubaexport did so, writing two letters to the U.S. Patent and Trademark Office on which it copied OFAC. On July 28, 2006, however, OFAC notified Cubaexport of its decision denying Cubaexport permission to renew the mark. OFAC explained to Cubaexport that "under these circumstances" (that is, after enactment of the 1998 law) the Cuban Assets Control Regulations barred renewal of the HAVANA CLUB

mark unless OFAC were to make an individualized exception (a "specific license"). The agency went on to say that it was denying Cubaexport's request for an individualized exception. OFAC denied that request based in part on the State Department's guidance that issuance of such a license to Cubaexport would be "inconsistent with U.S. policy."

This sequence of events belies Cubaexport's claim that it did not receive notice and an opportunity to be heard. Cubaexport obviously does not like the answer it received, but it was allowed to (and did) advance its arguments to OFAC.[7]

Relying on 5 U.S.C. § 558(c), Cubaexport separately suggests that a formal adjudication was necessary in order for the Government to deny renewal of Cubaexport's trademark. According to Cubaexport, because the regulatory exception for trademarks is called a "general license," OFAC's determination that Cubaexport no longer qualified for that exception constituted a license revocation governed by § 558(c). But even assuming that the general regulatory exception for trademarks meets the definition of a "license" for purposes of § 558(c), the text of § 558(c) does not require formal adjudications for license revocations. Section 558(c) mentions §§ 556 and 557 (which are the provisions governing formal adjudication) only in connection with license applications, not revocations. Four courts of appeals have so interpreted § 558(c). *See Gallagher & Ascher Co. v. Simon*, 687 F.2d 1067, 1073-75 (7th Cir. 1982) (collecting cases). Cubaexport cites a footnote to the contrary in *Porter County Chapter of the Izaak Walton League, Inc. v. NRC*, 606 F.2d 1363, 1368 n.12 (D.C. Cir. 1979). However, even accepting that this footnote applies to the regulatory exception at issue

---

[7] Cubaexport's procedural due process argument falters for the same reason.

here, that footnote observation was at best dicta, and we decline to elevate it now to a holding.

IV

Cubaexport also contends that OFAC's actions were, for a variety of reasons, substantively arbitrary and capricious in violation of the Administrative Procedure Act. *See* 5 U.S.C. § 706(2)(A). We can quickly dispatch those claims.

Cubaexport challenges OFAC's determination that the Cuban Assets Control Regulations did not authorize renewal of its trademark. But as we have already explained, the 1998 law passed by Congress applies to the HAVANA CLUB mark. OFAC was of course required to follow the 1998 law.

Cubaexport also objects that OFAC, in determining that the Cuban Assets Control Regulations did not authorize renewal of its trademark, primarily relied on factual findings from a related suit, *see Havana Club Holding, S.A. v. Galleon S.A.*, 203 F.3d 116, 127-30 (2d Cir. 2000), to which Cubaexport was not a party. Cubaexport argues that because it never had an opportunity to contest those findings before OFAC, it could not convince the agency that the original owner of the mark, José Arechabala, S.A., was insolvent when the Cuban government nationalized the business. Consequently, according to Cubaexport, the business was not "confiscated" under the terms of the 1998 Act. Even if we assume that Cubaexport could demonstrate the insolvency of José Arechabala, S.A., we believe it is obvious that the business was confiscated within the meaning of the statute. As both parties agree, the Cuban government nationalized the business's facilities, factories, and other industrial and commercial enterprises in 1960. *See* THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (3d ed.

1996) (defining confiscated as "[s]eized by a government; appropriated").

Cubaexport further contends that the agency acted irrationally in refusing to carve out an individualized exception to the 1998 Act for Cubaexport. Recall that even though the 1998 Act eliminated the general exception (the "general license") for certain trademarks, OFAC still retained residual authority to make an individualized exception to the trade embargo (a "specific license"). But Cubaexport has failed to show that OFAC acted unreasonably in declining to grant such an exception.

Cubaexport complains, in particular, that OFAC should not have relied on the State Department's advice in reaching its decision. That complaint doesn't make much sense. The State Department and OFAC are parts of a single Executive Branch headed by one President, and we decline to impose a novel Administrative Procedure Act rule that would deter one executive agency from consulting another about matters of shared concern. *See* U.S. CONST. art. II; *cf. Sierra Club v. Costle*, 657 F.2d 298, 405-06 (D.C. Cir. 1981). Here, moreover, it was entirely sensible for OFAC to reach out to the Department of State. After all, the State Department is an active participant in the Nation's foreign policy, and the Cuban embargo is of course a tool of foreign policy.

Finally, contrary to Cubaexport's contention, OFAC has not acted in an irrationally inconsistent manner in granting individualized exceptions to the Cuban embargo regulations. It is true that OFAC has allowed Cubaexport to pay legal expenses related to the HAVANA CLUB mark. But that is not inconsistent with OFAC's refusal to allow Cubaexport to renew that trademark. OFAC's longstanding regulations treat payment of legal expenses differently from transactions in

intellectual property. *See* 31 C.F.R. §§ 515.512 & 515.527(c). That is logical; after all, paying attorneys and registering or renewing a trademark may trigger different analyses of the competing interests. We see no reason that an exception to the regulations for legal expenses would require OFAC to make an exception for this matter.

\* \* \*

We have considered all of Cubaexport's arguments and find them without merit. We therefore affirm the judgment of the District Court.

*So ordered.*

SILBERMAN, *Senior Circuit Judge*, dissenting: The court's opinion, in my view, is unsound doctrinally, both with regard to principles of statutory interpretation and to basic tenets of administrative law. The Department of Treasury, through its Office of Foreign Assets Control ("OFAC"), has allowed Cuban companies to register trademarks in the United States under the Cuban Assets Control Regulations, *see* 28 Fed. Reg. 6974, 6982 (July 9, 1963), even though the companies are not permitted to sell their products here.[1] Cubaexport obtained its HAVANA CLUB trademark in 1976, pursuant to a general license in the Cuban Assets Control Regulations authorizing "[t]ransactions related to the registration and renewal . . . of patents, trademarks, and copyrights in which the government of Cuba or a Cuban national has an interest." 31 C.F.R. § 515.527(a)(1).

When Cubaexport sought to renew its trademark in 2006, OFAC, by a letter (an informal adjudication), concluded that renewal of the HAVANA CLUB trademark was prohibited. OFAC's director explained in a declaration to the district court that he based this decision on 31 C.F.R. § 515.527(a)(2), OFAC's regulation implementing section 211. OFAC also denied Cubaexport's request for a specific license to renew its trademark based on the same regulation. Nowhere in its declaration did OFAC ground its decision in its power to modify or revoke a general license pursuant to 31 C.F.R. § 501.803 (upon which the majority puts great significance).

\* \* \*

---

[1] That may be in anticipation of a regime change. As the Solicitor of Labor in 1970 at an International Labor Organization meeting in Geneva, I responded to a Cuban diplomat's attack on the U.S. with a disdainful rejection "because the Cuban government represented only a temporary political phenomenon." Time has stretched my term "temporary."

My disagreement with the majority centers on the court's disposition of Cubaexport's retroactivity argument. Cubaexport contends that the presumption against retroactivity, *see Landgraf v. USI Film Prods.*, 511 U.S. 244, 278-80 (1994),[2] requires us to read section 211 as barring only the new registration of trademarks, not the renewal of previously-registered trademarks such as Cubaexport's. The majority dismisses this appeal based on its notion that Cubaexport lacks a "vested right" in its HAVANA CLUB trademark. *See* Maj. Op. at 7. My colleagues may well be correct that the power OFAC enjoys to modify or revoke its trademark license at any time defeats Cubaexport's constitutional claim, but I do not think it appropriate to reach that question because I believe Cubaexport should prevail on its statutory interpretation argument, and the case should be remanded.

The majority, apparently using the term "vested rights" to mean something more than substantive rights, Maj. Op. at 8, misapplies governing Supreme Court jurisprudence regarding the interpretation of statutes – indeed does so in a fashion that drives a large hole in the presumption against retroactivity. The recent Supreme Court case upon which the court relies, *Fernandez-Vargas v. Gonzales*, 548 U.S. 30 (2006), states that "[s]tatutes are disfavored as retroactive when their application 'would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed.'" 548 U.S. at 37 (quoting *Landgraf*, 511 U.S. at 280). To be sure, *Fernandez-Vargas* cited an early case in which Justice Story referred to "vested rights," *see id.* (quoting *Soc'y for the Propagation of the*

---

[2] *See also Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) ("Retroactivity is not favored in the law. Thus, congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result.").

*Gospel v. Wheeler*, 22 F. Cas. 756, 767 (No. 13,156) (CCNH 1814)), but *Fernandez-Vargas* then equated "vested" with "substantive" (as distinct from procedural), *id.* The Supreme Court's retroactivity jurisprudence consistently frames the protected rights as "substantive." *See, e.g.*, *Lindh v. Murphy*, 521 U.S. 320, 326 (1997); *Landgraf*, 511 U.S. at 278. (In his *Landgraf* concurrence, Justice Scalia made clear that the majority's use of the phrase "vested rights" meant only to differentiate substantive rights from procedural ones. *See Landgraf*, 511 U.S. at 290-91 (Scalia, J., concurring).) Indeed, the other cases cited by the majority also use "vested" and "substantive" interchangeably.[3] If the presumption against retroactive legislation protected only substantive rights that are somehow invulnerable – that could not be threatened by other legal attacks – the presumption's value would be degraded substantially.

There is no question that Cubaexport had a substantive "right" to its trademark; otherwise, what did its trademark mean? Whether OFAC could revoke that right – and under what conditions[4] – is quite beside the point. As I noted, the government nowhere purported to exercise its revocation authority in this case. (It may well be that an OFAC license

---

[3] The majority cites *Celtronix Telemetry Inc. v. FCC*, 272 F.3d 585 (D.C. Cir. 2001), for the proposition that a party does not have a vested right in a licensing regime if the government retains the power to alter the terms of existing licenses by rulemaking. Maj. Op. at 10 (citing *Celtronix Telemetry*, 272 F.3d at 589). But *Celtronix*'s holding is not so broad. There, we considered whether a party's right to request payment grace periods for a video and data service license from the FCC was a vested right. *Id.* at 589. But as *Celtronix* makes clear, the right in question was merely "procedural."

[4] Would not the APA's arbitrary and capricious standard govern OFAC's authority?

revocation carries implications not apparent to us.) It is, moreover, a patent violation of *SEC v. Chenery Corp.*, 318 U.S. 80 (1943), for a reviewing federal court to uphold agency action based on a legal theory – let alone a potential agency action – that the agency did not initiate or embrace. That the government contends that OFAC *could* exercise that power, as *Chenery* explained, decidedly is not a relevant consideration. *Chenery*, 318 U.S. at 88.

In any event, as the majority concedes, Maj. Op. at 8 n.4, quite apart from its "vested rights" approach to the presumption against retroactivity, the presumption applies, as well, if a statute would "impose new duties with respect to transactions already completed." *Fernandez-Vargas*, 548 U.S. at 37. As I discuss below, OFAC, by interpreting section 211's "transaction" to not include a renewal of a trademark – and therefore to require Cubaexport to seek a new license for its renewal – is certainly imposing a new duty if renewal rights are automatic, and bound up with the initial registration of the trademark. I think the majority errs in not reading Cubaexport to assert that it did not complain that section 211 imposed any new or increased liabilities or duties for past conduct. *See* Maj. Op. at 8 n.4. Cubaexport broadly argued that section 211 "'attaches new legal consequences to events completed before its enactment.'" Appellant's Opening Brief at 27 (quoting *Landgraf*, 511 U.S. at 270).[5]

---

[5] Since the majority relies on a "vested rights" theory not advanced by the government, its rather strained contention that Cubaexport did not object to the new duty of renewal – which it did – violates the "chuztpah" doctrine. *See Harbor Ins. Co. v. Schnabel Found. Co.*, 946 F.2d 930, 937 & n.5 (D.C. Cir. 1991); *Nw. Airlines, Inc. v. Air Line Pilots Ass'n, Int'l*, 808 F.2d 76, 83 (D.C. Cir. 1987).

Turning to Cubaexport's argument that the government is improperly applying section 211 retroactively, the obvious initial inquiry is whether section 211 speaks prospectively only, or both prospectively and retrospectively. I think section 211 is more naturally read – even without the presumption – as applying to the future only. It states that "[n]otwithstanding any other provision of law, no transaction or payment *shall be authorized or approved* pursuant to Section 515.527" (the licensing regulations). Omnibus Consolidated and Emergency Supplemental Appropriations Act of 1999, Pub. L. No. 105-277, 112 Stat. 2681 (1998), § 211 (emphasis added). OFAC obviously realized this because it issued a regulation implementing the statute, which changed "shall be authorized or approved" to "*is* authorized or approved" (which the majority ignores). 31 C.F.R. § 515.527(a)(2) (emphasis added). And the district court also saw section 211 as speaking only prospectively, but it concluded that although Cubaexport's registration of its trademark was unaffected, a renewal could be stopped because it was a separate "new" transaction. *See Empresa Cubana Exportadora de Alimentos y Productos Varios v. Dep't of Treasury*, 606 F. Supp. 2d 59, 81 (D.D.C. 2009). That is the government's essential statutory argument before us – not the "vested rights" theory advanced by the majority – that renewal was a new transaction that OFAC had to authorize or approve, and therefore section 211 applied to all trademark renewals undertaken after its passage.

The key question, then, is the interpretation of the word "transaction" in section 211. I read section 211 as certainly, at least, suggesting that a "transaction" includes both the registration, as well as necessary renewals, because renewal is not separately mentioned, and therefore implicitly is coupled with the initial license registration. Cubaexport drives that point home by persuasively explaining that under our governing trademark law, a holder's right to a trademark, "once acquired,"

is "perpetual" unless abandoned. *Ewing v. Standard Oil Co.*, 42 App. D.C. 321, 324 (1914); *see also Qualitex Co. v. Jacobson Prods. Co., Inc.*, 514 U.S. 159, 165 (1995). Renewal "in no sense confers new rights," and instead, "amounts only to a record of existing rights." *Ewing*, 42 App. D.C. at 324. The government would have us ignore *Ewing* simply because it is an old case – but that argument is silly. In any event, it seems clear that the Patent and Trademark Office must renew a trademark when requested, so long as the holder pays the usual fee and submits an affidavit describing the mark's use or explaining its non-use. *See* 15 U.S.C. §§ 1058(b), 1059(a). The only purpose of a renewal is to remove an abandoned trademark from the register. *See Ewing*, 42 App. D.C. at 324; *In re Bose Corp.*, 580 F.3d 1240, 1246 (Fed. Cir. 2009); *Torres v. Cantine Torresella S.r.l.*, 808 F.2d 46, 48 (Fed. Cir. 1986)). It does not add to, subtract from, or alter a trademark holder's substantive rights in the trademark. The government does not dispute this proposition.

To be sure, the use of the additional word "payment" in section 211 is anomalous. It is possible, although hardly obvious, that by using the word "payment" Congress sought to require a Cuban trademark holder to obtain a separate payment license before it could renew its trademark. If we give "payment" this separate meaning, it would render invalid section 515.527(a)(1)'s implicit authorization to pay renewal fees. And, as a result, section 211 would have retroactive effect. But while this reading is barely plausible, certainly section 211 does not mandate it. At most, this plausible interpretation of "payment" creates an ambiguity as to whether section 211 authorizes OFAC to act retroactively.

The majority is not influenced by the Second Circuit's observation, in a related case, that "[s]ince section 211 does not clearly indicate that it should be applied retroactively, the

traditional presumption against retroactivity would likely apply." *Havana Club Holdings SA v. Galleon SA*, 203 F.3d 116, 128-129 (2d Cir. 2000).[6] The Second Circuit dutifully relied on the Supreme Court's opinion in *Landgraf*, the leading case explaining that a statute is presumed to apply prospectively only, in observing that section 211 should be construed as limited to transactions occurring after the statute's passage. I think we are obliged to do so as well. Our inquiry should be at an end because "the agency has misconceived the law," and the case should be remanded. *Chenery Corp.*, 318 U.S. at 94.

I respectfully dissent.

---

[6] The Second Circuit's observation was dicta because the provision at issue, not implicated in this case, spoke of the propriety of prospective relief only. But its conclusion regarding section 211 nevertheless contradicts the majority's opinion and supports my position.